# In the United States Court of Federal Claims

No. 19-892C
(Filed: September 23, 2019)
(Re-Filed: October 7, 2019)[1]

* * * * * * * * * * * * * * * * * * *

| | |
|---|---|
| LOC PERFORMANCE PRODUCTS, INC., | Bid protest; post-award bid protest; 28 U.S.C. § 1491(b)(4) (2018); 48 C.F.R. § 15.306 (2018); technical evaluation; competitive range determination; responsibility determination; prejudice. |
| *Plaintiff*, | |
| v. | |
| THE UNITED STATES, | |
| *Defendant.* | |

* * * * * * * * * * * * * * * * * * *

*Christian B. Nagel*, Tysons, VA, for plaintiff. *Gregory R. Hallmark* and *Amy L. Fuentes*, of counsel.

*Eric E. Laufgraben*, Trial Attorney, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, with whom were *Joseph H. Hunt*, Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, *Douglas K. Mickle*, Assistant Director, for defendant. *Robert B. Nelson*, Lieutenant Colonel, U.S. Army, Chief, Trial Team II, Contract & Fiscal Law Division, U.S. Army Legal Services Agency, of counsel.

OPINION

BRUGGINK, *Judge*.

This is a post-award bid protest by Loc Performance Products, Inc. ("Loc"), of an award by the Army of contracts for armor and turret system hardware and platform integration kits, which are parts of weapons systems on military tactical vehicles. The Army awarded contracts to two companies,

---

[1] This opinion was originally issued under seal to permit the parties an opportunity to propose redactions on or before October 4, 2019. The parties proposed redactions on October 4, and we adopt their redactions.

O'Gara-Hess & Eisenhardt Armoring Company LLC ("O'Gara") and Ibis Tek, Inc. ("Ibis Tek"), neither of which intervened in this protest.

The parties filed cross-motions for judgment on the administrative record. The matter is fully briefed, and we held oral argument on September 17, 2019. Because the Army rationally evaluated Loc's proposal and excluded it from the properly-constructed competitive range, we deny plaintiff's motion for judgment on the administrative record and grant the government's motion.

BACKGROUND

The Army published a request for proposals ("RFP") on October 25, 2017, seeking parts of military tactical vehicles' weapons systems: armor and turret system hardware and platform integration kits.[2] The Army would award up to three indefinite delivery, indefinite quantity contracts based on which proposals offered the best value to the Army. It planned to award contracts without discussions, but reserved the right to engage in discussions and to allow offerors to revise their proposals. The solicitation stated that the Army could set a competitive range and limit it to the greatest number of offers that would permit efficient competition among the most highly rated proposals.

The solicitation also repeatedly advised offerors that they were responsible for providing sufficient detail and evidence to allow the Army to perform its evaluation. Administrative Record ("AR") 183-85. The Army first stated its expected production rates for the solicited products in the Delivery or Performance section: "Up to 50 kits per month for each of the Armor Hardware, turret systems and [platform integration kits] configurations and related spares along with the capability to ramp up within 6 months to a minimum of 300 kits per month of each configuration related spares." AR 155.

---

[2] Armor hardware is "Gunner Protection Panels and Kits," which include "mechanical, electrical and electromechanical components such as cables, gunner accessory package, turret drive motors, controllers and transparent armor." Administrative Record 138. A turret system is "hatch assembly, slew bearing and gear ring for tactical vehicles," which will interface with Gunner Protection Kits. *Id.* Platform integration kits "provide the unique mechanical and electrical interfaces to integrate Remote Weapon Systems [] to a variety of U.S. Government [] platforms." *Id.*

A Source Selection Evaluation Board ("SSEB") would evaluate proposals on three factors: Technical, Past Performance, and Price. The Technical factor was most important, and the Technical and Past Performance factors combined were more important than Price. The Army could award a contract to other than the lowest-priced offeror or the highest technically rated offeror.

The Technical factor includes three subfactors: Manufacturing Plan, Quality Assurance Plan, and Management Plan. The Manufacturing Plan and Quality Assurance Plan were equally important, and each was more important than the Management Plan. The Army would evaluate each subfactor for strengths, weaknesses, and uncertainties. It would assign an adjectival rating (Outstanding, Good, Acceptable, Marginal, or Unacceptable) to each subfactor and a cumulative rating for the Technical factor. Relevant here are the ratings "Acceptable" and "Marginal." A "Marginal" Technical rating means that the "[p]roposal has not demonstrated an adequate approach and understanding of the requirements, and/or risk of unsuccessful performance is high." AR 191. An "Acceptable" Technical rating means that the "[p]roposal meets requirements and indicates an adequate approach and understanding of the requirements, and risk of unsuccessful performance is no worse than moderate." *Id.* Loc challenges its overall rating on the Technical factor and its ratings on subfactors 1 and 3.

Under Technical Subfactor 1: Manufacturing Plan, the Army required a detailed, realistic, supportable plan for producing and testing armor hardware, turret systems, and platform integration kits. The Army directed offerors to describe "the complete Armor Hardware, Turret Systems and [platform integration kits], including cable harness assemblies, gunner accessory package [], turret drive motors, controllers and transparent armor" as well as "essential manufacturing facilities and equipment." AR 263.

The Army also instructed offerors to "[p]rovide a complete flow diagram of the proposed assembly line, including test, inspection, and build." *Id.* The Army repeated here that offerors must indicate "capability to meet production rates of a minimum of 50 kits per month as a minimum along with the capability to ramp up within 6 months to a minimum of 300 kits per month for each of the configurations." *Id.* It also directed offerors to propose subcontractors and describe their involvement.

Under Technical Subfactor 2: Quality Assurance Plan, the Army required offerors to describe their Quality Management System and how the

offeror would address quality requirements with subcontractors and suppliers.

Under Technical Subfactor 3: Management Plan, the Army required offerors to detail how manufacturing would meet the solicitation requirements. This included a detailed Integrated Master Schedule ("IMS"), which is a multilayered schedule of tasks for completing the target effort. The Army explained: "The IMS should include all events to be accomplished and support each task achievement criteria. Include a breakdown of the Armor Hardware, Turret Systems and [platform integration kits] in substantial detail showing specific piece-parts, sub-assemblies and components required. Include/discuss parts and assemblies that have lead times in excess of 120 days." *Id.*

The Army further required a description of the offeror's Configuration Management System, addressing "how engineering changes, deviations and waivers to drawings and specifications are processed, reviewed, and acted upon." *Id.* The description needed to include the organization of the Configuration Management System, a chart of individuals involved, and a plan to address configurations changes with subcontractors.

The solicitation requirements included Sections C.3.4 Start of Work Meeting, C.3.5 Accident/Incident Report, C.3.6 Warranty, and C.5 OPSEC Requirements. Each section stated the agency's basic expectation. For instance, the start of work meeting would occur within thirty days after contract award and the minimum warranty was 12 months. The solicitation also required offerors to propose a first article test plan, which would allow the Army to respond to the first article test report "[w]ithin 30 calendar days after receiving the test report." AR 149.

To satisfy Factor 2 Past Performance, the Army required offerors to "identify pertinent past history, which indicates that similar efforts of equal or greater complexity have been performed using the [offeror's] existing plant capability and demonstrate satisfaction of customer requirements." AR 264. It requested a list of contracts in performance or awarded within the past three years. The Army would evaluate Past Performance for relevance and quality, assigning a rating of Substantial Confidence, Satisfactory Confidence, Neutral Confidence, Limited Confidence, or No Confidence. Loc does not challenge its rating on Past Performance.

Regarding Factor 3 Price, the Army directed offerors to submit pricing according to the RFP's Pricing Matrix, which covered pricing for all

production and spares line items. The Army would calculate a "total evaluated price" for each offer and review the contract line items for unbalanced pricing. The Army would evaluate prices for reasonableness and use that determination in its best value tradeoff analysis.

Fourteen offerors submitted proposals, which the SSEB evaluated according to the three factors. It rated Loc "Marginal" on the Technical factor overall and "Substantial Confidence" on Past Performance. Loc's total evaluated price was [            ].

Loc's Manufacturing Plan, Technical subfactor 1, proposed [
] for manufacturing the armor hardware, turret systems, and platform integration kits. "Loc's overarching plan for the production, procurement, and inspection of the GPK System kits will utilize [
            ], as well as leverage Loc's robust supply base." AR 859. Loc explained that two kits would be manufactured [            ] whereas manufacturing the turret system kit required [
    ]. Loc represented that [
        ]. Loc provided layouts of its manufacturing capacity in [
    ].

Loc explained that [            ] had the capacity to produce fifty gunner protection kit systems per month. It "had identified constraints and developed plans to meet the demands for ramping up to 300 kits per month." AR 876. Loc concluded that, although the [            ] could produce 300 kits per month, the [        ] "would need to [
    ] or [                            ]" to produce 300 kits per month. AR 879. Loc provided some explanation of what [        ] it would need and stated that "Loc is prepared to [
    ] or [                        ]," but it did not offer a specific timeline or plan for [        ]. *Id.*

Loc also included a flow diagram of its assembly line. Its Figure 20 was "a sample production flow diagram that will be utilized for the GPK System Program at the [    ] facility." AR 873. That diagram listed four parts above a diagram of "Example Assembly Flow for four PN's at the [    ] Plant." *Id.* Loc included a paragraph explaining its assembly line.

On Technical subfactor 1, the SSEB rated Loc's Manufacturing Plan "Marginal." It found a significant weakness regarding the ramp up plan and a weakness regarding the assembly line flow diagram. A significant weakness existed because "the offeror [did] not provid[e] a plan or timeline

for [                                                                                          ] to meet the 300 kits per month production rate." AR 1756. The SSEB found "no indication that the rate of 300 kits per month could be reached within a 6 month period." *Id.* The SSEB also assigned a moderate risk weakness because "the offeror did not provide adequate and complete flow diagram of the proposed assembly line." *Id.* Overall, the SSEB concluded that Loc's Manufacturing Plan presented a high risk of unsuccessful performance. Loc protests its Manufacturing Plan rating.

Loc's Quality Assurance Plan, Technical subfactor 2, provided narrative and visual explanations of its quality assurance processes. The SSEB found that Loc's Quality Assurance Plan was thorough, rating it "Good." It assigned Loc a strength for exceeding its expectations and found no weaknesses. The SSEB concluded that the Loc's Quality Assurance Plan presented a low risk of unsuccessful performance. Loc does not protest its Quality Assurance Plan rating.

Loc's Management Plan, Technical subfactor 3, provided its IMS, the multilayered schedule showing how tasks will come together to complete manufacture, but Loc's IMS addressed only one part, the [                                 ]. Loc reasoned that the solicitation only instructed offerors to address parts with particularly long lead times when it stated: "The IMS should include all events to be accomplished and support each task achievement criteria. Include a breakdown of the Armor Hardware, Turret Systems and [platform integration kits] in substantial detail showing specific piece-parts, sub-assemblies and components required. *Include/discuss parts and assemblies that have lead times in excess of 120 days*." AR 263 (emphasis added). Because only the [                ] had a more than 120-day lead time, Loc limited its discussion to that part in its IMS.

Loc also provided a narrative explanation and flow chart of its Configuration Management System. That system addressed Engineering Change Notices and how those notices move through Loc's management system. Loc did not use the term "Engineering Change Proposal" or the acronym "ECP," but it did discuss Engineering Change Notices.

Loc listed RFP Sections C.3.4 Start of Work Meeting, C.3.5 Accident/Incident Report, C.3.6 Warranty, and C.5 OPSEC Requirements in its "Responsibility Assignment Matrix," which was a chart marking who was responsible for each section. Regarding Section C.3.4 Start of Work Meeting, Loc stated in its Project Integration Management paragraph that "Loc will hold a Start of Work [] meeting with Government to establish the baseline

requirements and stakeholders' expectations along with identifying the [                              ] [] to manage the program." AR 898. Loc also mentioned the start of work meeting in its Project Communication Management paragraph, stating that Loc and the government would develop a [                   ] at the start of work meeting. Regarding Section C.5 OPSEC Requirements, in its Project Communication Management paragraph Loc stated, "Loc has an [                              ] to complete annual OPSEC training for the personnel assigned to the program." AR 900. Loc did not provide a dedicated section of its proposal addressing Sections C.3.5 Accident/Incident Report or C.3.6 Warranty.

Regarding the first article test approval process and its relationship to the production schedule, Loc proposed to deliver the first article test report on [          ], and begin first month production on [               ].

The SSEB found one significant weakness, two other weaknesses, and a point of uncertainty in Loc's Management Plan and rated it "Marginal." It determined that Loc's IMS presented a significant weakness because its schedule did not include "piece-parts, subassemblies, or components but instead gave a very high and general overview of the schedule." AR 1757-58. The SSEB found that "insufficient detail in the IMS appreciably increases the risk of unsuccessful contract performance." AR 1758.

Furthermore, Loc's Management Plan presented a moderate risk weakness because it failed to provide an adequate description of the process for reviewing and acting on engineering changes, specifically how an "ECN becomes an ECP." AR 1758. Loc's Management Plan also presented a moderate risk weakness because it failed to address the solicitation requirements for Sections C.3.4 Start of Work Meeting, C.3.5 Accident/Incident Report, C.3.6 Warranty, and C.5 OPSEC Requirements.

Finally, the Army was uncertain regarding the start of production pending first article test approval because Loc proposed starting production during the Army's 30-day approval period. Based on these three weaknesses and the perceived uncertainty, the Army considered Loc a high risk of unsuccessful performance. Loc protests its Management Plan rating.

To satisfy the Past Performance factor, Loc provided eight questionnaire responses, all of which the Army found relevant. Four responses indicated substantial confidence, three indicated satisfactory confidence, and one indicated that Loc at least met contractual minimums.

The SSEB assigned "Substantial Confidence" to Loc's ability to perform the contract based on its past experience. Loc does not protest this assessment.

On Price, the SSEB found that Loc had a total evaluated price of [    ]. Loc properly proposed unit prices for all line item numbers and quantity ranges as required by the RFP. The SSEB found, however, that Loc's pricing "appears to be unbalanced from quantity range to quantity range for the [

] . . . ." AR 2237. The SSEB found that "[

]." *Id*. The SSEB also compared Loc's total evaluated price to the Independent Government Cost Estimate evaluated price, [    ] million, concluding that Loc's price was [            ].

Thirteen other offerors submitted proposals. The SSEB rated four offers "Unacceptable" overall on the Technical factor, meaning they were ineligible for award. We list the other ten offerors' ratings below (including Loc's ratings for context):

| Offerors | Subfactor 1 | Subfactor 2 | Subfactor 3 | Technical Overall | Price (Millions) | Past Performance |
|---|---|---|---|---|---|---|
| Awardees | | | | | | |
| **O'Gara** | Acceptable | Acceptable | Good | Acceptable | [  ] | Substantial Confidence |
| **Ibis Tek** | Acceptable | Acceptable | Marginal | Acceptable | [  ] | Satisfactory Confidence |
| Also Included in the Competitive Range | | | | | | |
| [  ] | [  ] | [  ] | [  ] | [  ] | [  ] | [  ] |
| [  ] | [  ] | [  ] | [  ] | [  ] | [  ] | [  ] |
| [  ] | [  ] | [  ] | [  ] | [  ] | [  ] | [  ] |
| Excluded from the Competitive Range | | | | | | |
| [  ] | [  ] | [  ] | [  ] | [  ] | [  ] | [  ] |
| **Loc** | Marginal | Good | Marginal | Marginal | [  ] | Substantial Confidence |
| [  ] | [  ] | [  ] | [  ] | [  ] | [  ] | [  ] |
| [  ] | [  ] | [  ] | [  ] | [  ] | [  ] | [  ] |

8

| [ ] | [ ] | [ ] | [ ] | [ ] | [ ] | [ ] |
|---|---|---|---|---|---|---|

After the SSEB completed the evaluation of each factor for each offer, it "identified several areas of concern." AR 2183. The SSEB chairperson and contracting officer briefed the Source Selection Authority ("SSA"), and "[a]t the conclusion of the briefing, as a result of varying evaluation results and a range of prices," the SSA determined that it would be beneficial to enter into discussions for revision of certain technical points and prices. *Id.* The SSA decided to set a competitive range of less than all of the most highly rated proposals for efficiency.

The Pre-Negotiation Objective memorandum, signed by the contracting officer after briefing the SSA, provided context for why the Army decided not to enter into discussions with certain offerors. Regarding Loc, the Army stated that the combination of Loc's Technical weaknesses "increases the risk of unsuccessful contract performance to an unacceptable level." AR 2185. The Army concluded that "going into discussions with this offeror would result in a proposal re-write and therefore, [Loc] will not be included in the competitive range." *Id.*

The competitive range determination began with a summary of what the Army considered in setting the range:

> The Government evaluated proposals and determined which were the most highly rated and eligible for inclusion in the competitive range relying on the merits of each offer. The merits of each offer were determined on the basis of (1) [t]he quality of the technical proposal based on the ratings of each proposal against all evaluation Criteria[;] (2) [t]he past performance rating[; and] (3) [t]he proposed cost/prices.

AR 2207.

Before setting out the "supporting rationale for the factor ratings" for all offers, the SSA summarized that the competitive range would include O'Gara, Ibis Tek, [                    ] "whose overall initial technical factor ratings were Acceptable or higher." AR 2208. The Army planned to conduct discussions with those five offerors because the Army had identified weaknesses in all of their Technical proposals and because it had price concerns about [                              ].

The SSA repeated the rationale for each offeror's ratings before returning to the five offerors in the range. He summarized salient information for each offeror: the Technical rating ("Good" for [    ] and "Acceptable" for the other four offerors), the Past Performance rating, and the total evaluated price of each. The SSA concluded that the Technical and Past Performance ratings "coupled with their total proposed prices establishes these Offerors with enough merits to be included in the competitive range as their proposals offer the best value to the Government." AR 2268.

The Army allowed offerors in the competitive range to engage in discussions and revise their proposals. The offerors submitted final proposals on September 28, 2018. The SSA then completed a source selection decision, performing a best value tradeoff and finding that O'Gara and Ibis Tek offered the most benefit to the Army. The contracting officer also completed a price negotiation memorandum, finding both awardees' prices reasonable.

In the source selection decision, the SSA compared the Technical, Past Performance, and Price rankings for each of the five offerors in the competitive range. The SSA found that O'Gara's "Acceptable" Technical rating (the most important factor) coupled with its [          ] evaluated price in the competitive range made O'Gara "the most advantageous proposal." AR 2787. The SSA also noted that O'Gara offered [
                                                                                        ].

The Army had the flexibility to award up to three contracts. After it concluded that O'Gara offered the best value proposal, the SSA found that "[t]o enhance the production capability and competition during the life of the contract, it is in the Government's best interest to secure a second source." *Id.* The SSA decided that, because Ibis Tek also had an "Acceptable" Technical score, "Satisfactory Confidence" Past Performance score, and the [          ] evaluated price, Ibis Tek was the next best proposal. The SSA decided it was worthwhile to award a contract to Ibis Tek, because "[t]he minimum guarantee for each multiple award contract is low enough that it makes it beneficial for the Government to pay $100,000.00 to have a second source available to meet the requirements." *Id.* Making two contract awards increased competition for delivery orders and flexibility for meeting demand during high demand periods.

The SSA considered [     ] next, due to its highest overall Technical rating ("[   ]") paired with a [       ] both awardees. The SSA determined that it would not be beneficial to the Army to award a third contract to [     ], because its [           ] proposal meant that it would not

offer "realistic competition" to O'Gara and Ibis Tek during contract performance. AR 2788. The SSA noted that the Army had anticipated that a third contract might result in an "idle award" and decided to forego awarding a third contract to [    ]. *Id.*

Likewise, the SSA weighed the benefits of awarding a contract to [   ], but concluded that "the best possible mix of production capacity versus current and future requirements is best satisfied by two contractors." *Id.* Making a third award "would represent disproportionate excess production capacity in relationship to the anticipated fieldings, resulting in production capacity and labor force, and thus a detriment rather than a benefit, to all three contract awardees." *Id.* The SSA concluded that "O'Gara and [Ibis Tek] provide the best overall value to the Government" and would be awarded contracts. AR 2789.

The contracting officer made a responsibility determination for both O'Gara and Ibis Tek. Regarding [       ], the contracting officer relied on review of the System for Award Management and the exclusions recorded there; the Past Performance Information Retrieval System; the Federal Awardee Performance and Integrity Information System; and the information in the pre-award survey prepared by the Defense Contract Management Agency. The contracting officer determined, among other responsibility findings, that as of January 2019 [     ] had a satisfactory performance record and a satisfactory record of integrity and business ethics.

After the Army provided Loc with its post-award briefing, Loc protested at GAO and GAO dismissed its protest as untimely. Loc filed its complaint here on June 18, 2019.

DISCUSSION

Plaintiff advances three arguments: (1) that the Army arbitrarily assigned weaknesses to Loc's Technical proposal; (2) that the Army contravened the solicitation by only considering the Technical factor in its competitive range determination; and (3) that the Army abused its discretion in assigning "[                    ]" to [           ] Past Performance and improperly determined that it was a responsible contractor. Our review of the Army's decisions considers whether they were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706 (2018); 28 U.S.C. §1491(b)(4) (2018). In other words, the court's "task is to determine whether the procurement official's decision lacked a rational basis or the procurement procedure involved a violation of

11

a regulation or procedure." *Tinton Falls Lodging Realty, LLC v. United States*, 800 F.3d 1353, 1358 (Fed. Cir. 2015) (citation omitted). If the Army's decisions fail to meet this standard of review, the protestor must also show that it was prejudiced by the Army's conduct, specifically whether, absent the error, it would have had a substantial chance of receiving the contract. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351-53 (Fed. Cir. 2005).

For the reasons discussed below, Loc has not demonstrated that the Army's ratings and competitive range determination lacked a rational basis or violated the law. Because Loc would not have a substantial chance of award even if [    ] were excluded, we do not reach the question of [    ] representations and responsibility. We therefore deny plaintiff's motion for judgment on the administrative record and grant the government's motion.

I.  The Army Rationally Rated Loc's Technical Proposal "Marginal."

Loc disagrees with the Army's evaluation of its Technical proposal, arguing that the Army should have rated Loc "Acceptable" and included it in the competitive range. We disagree. Loc has not shown that the Army's rating of Loc as "Marginal" was arbitrary, capricious, or an abuse of discretion.

An agency is entitled to discretion in its evaluation of offers. *Grumman Data Sys. Corp. v. Widnall*, 15 F.3d 1044, 1046 (Fed. Cir. 1994). Technical evaluations, in particular, are "the minutiae of the procurement process . . . which involve discretionary determinations of procurement officials that a court will not second guess." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996). When a protestor challenges the agency's evaluation as arbitrary or capricious, the court looks at whether the agency's decision "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Here, Loc disputes the "Marginal" rating it received on two subfactors, and on Technical overall, instead of "Acceptable" ratings. The difference between the ratings is that "Marginal" indicates a belief that the offer presents a less than adequate approach and understanding or a high risk of unsuccessful performance, whereas "Acceptable," one step higher,

indicates an adequate approach and understanding or no worse than moderate risk of unsuccessful performance. AR 191.

Regarding Loc's "Marginal" Manufacturing Plan, plaintiff has not demonstrated that the Army failed to consider all of the information Loc provided or that it implausibly evaluated Loc's proposal. The Army assigned Loc a significant weakness because it did not sufficiently explain how it would ramp up to 300 kits per month in a six-month timeframe using [         ] and potentially subcontractors. Although Loc represented that its [          ] had 300-kit-per-month capacity at the time of the proposal, Loc also represented that the [        ] would be involved in the manufacturing process. For the [        ], Loc "would need to [                  ] or [                              ]" to produce 300 kits per month. AR 879.

The agency's confusion is completely understandable. Loc's proposal regarding production rates was made unclear by its explanation that [       ] would be needed to reach peak production rates and that the [        ] would require [              ] or [       ] to reach the 300 unit level, but it neglected to give a solid commitment as to when that would happen. Loc was responsible for presenting information in a detailed, clear fashion, and the agency acted within its discretion when it determined that Loc's Manufacturing Plan did not provide sufficient assurance that Loc was able to ramp up to a higher production rate within the time required.

The Army also assigned Loc a weakness for failing to provide a complete flow diagram of its assembly line. Loc provided a flow diagram depicting the assembly line for four parts, by way of an example. This diagram left room for reasonable minds to differ on whether the example [   ] facility assembly line provided a complete picture of Loc's process to test, inspect, and build. The Army was not required to read into the proposal the explanation that the same flow diagram applied to all parts and was within its discretion to rate Loc "Marginal" on its Manufacturing Plan.

Regarding Loc's "Marginal" Management Plan, the SSEB assigned Loc a significant weakness for failing to provide a thorough IMS. The solicitation stated, "The IMS should include all events to be accomplished and support each task achievement criteria. Include a breakdown of the Armor Hardware, Turret Systems and [platform integration kits] in substantial detail showing specific piece-parts, sub-assemblies and components required. Include/discuss parts and assemblies that have lead times in excess of 120 days." AR 263.

Loc read this section to mean that it was only required to address parts and assemblies with long lead times; in other words, Loc did not believe it needed to provide "substantial detail showing specific piece-parts, sub-assemblies and components required." *Id.* Loc chose to address only one part because it was the only part with a lead time of more than 120 days. The Army understood this section to mean that offerors should address all events to be accomplished; piece-parts, sub-assemblies, and components required; and parts and assemblies with long lead times. The Army found Loc's approach wanting because it did not cover piece-parts, sub-assemblies, and components, and it assigned Loc a significant weakness.

We agree with defendant that the last sentence of the section should not be read to negate the prior two sentences. The IMS section unambiguously communicates that the Army wanted a detailed, multilayered schedule, comprehensively reviewing the tasks and all parts involved. The Army rationally concluded that Loc's Management Plan presented a significant weakness. If Loc was confused regarding the amount of detail the IMS should provide, it had the opportunity to question how the Army would apply the section prior to submitting its proposal.

The Army also assigned two moderate risk weaknesses and an uncertainty to Loc's proposal. The Army found gaps in the information Loc presented regarding how Loc addressed engineering changes, how Loc addressed various solicitation sections such as warranty and OPSEC requirements, and how production would proceed after the first article test. The SSEB was perhaps ungenerous in filling gaps in Loc's descriptions, but Loc did in fact fail to fully address at least two solicitation requirements—warranty and the accident/incident report—in its proposal. Loc has not shown that the agency ignored relevant information or reached contradictory conclusions; instead, the Army exercised its discretion when it found these to constitute moderate weaknesses.

Even if the Army was incorrect on the moderate risk weaknesses in Loc's Management Plan, Loc's Technical proposal still contained the two other significant weaknesses we discussed above. Loc failed to show that the Army improperly rated its Technical proposal "Marginal" overall. As such, Loc cannot demonstrate that it had a substantial chance of award unless it can show that the Army was required to include it in the competitive range, which we address below.

II.     The Army Properly Set the Competitive Range.

Loc argues that the agency improperly set the competitive range by using the Technical rating "Acceptable" as the exclusive demarcation line, while failing to consider the Past Performance and Price factors. We disagree. The Army considered all factors and was within its discretion to rely on the Technical factor to determine which offers should be included in the competitive range.

After an agency evaluates proposals according to the factors stated in the solicitation, if the agency intends to conduct discussions, it will establish a competitive range. FAR 15.306(c)(1). "Based on the ratings of each proposal against all evaluation criteria, the contracting officer shall establish a competitive range comprised of all of the most highly rated proposals, unless the range is further reduced for purposes of efficiency . . . ." *Id.* If the contracting officer determines that "the number of most highly rated proposals . . . exceeds the number at which an efficient competition can be conducted," and the solicitation notified offerors, "the contracting officer may limit the number of proposals in the competitive range to the greatest number that will permit an efficient competition . . . ." FAR 15.306(c)(2).

FAR 15.306(c) notably does not require the agency to perform any tradeoff between price and other non-cost factors when establishing a competitive range. *Comp.* FAR 15.101, 15.101-1 (best value tradeoff), *with* FAR 15.306(c) (competitive range). The contracting officer likewise is not required to redo the technical evaluators' work in setting the range; instead the range is based on "the ratings of each proposal against all evaluation criteria." FAR 15.306(c)(1). The agency is authorized to limit the range beyond the most highly rated proposals to "the greatest number that will permit an efficient competition." FAR 15.306(c)(2). The FAR does not specify how the agency must decide how many proposals will create efficient competition.

Contracting officers have "broad discretion in determining competitive range," and the court will not disturb that determination "unless clearly unreasonable." *Birch & Davis Int'l, Inc. v. Christopher*, 4 F.3d 970, 973 (Fed. Cir. 1993). It is not this court's role to substitute our judgment for that of the agency, and "the agency does not have to include all technically acceptable proposals that have a low price in the competitive range." *Red River Computer Co., Inc. v. United States*, 120 Fed. Cl. 227, 239 (2015). The court is concerned with whether the agency took proposals' ratings into

15

account in setting the range and explained the reasoning underlying which proposals were included and excluded.

First, there is no dispute that the Army thoroughly evaluated all three factors—Technical, Past Performance, and Price—before setting the competitive range. It assigned ratings on the Technical and Past Performance factors. As to Price, it determined the total evaluated price of each offer and compared it to the Independent Government Cost Estimate. The only step the Army saved for after discussions was the price reasonableness analysis, which would be used as part of the best value tradeoff.

Second, the Army considered the ratings on all three factors when deciding how to set the competitive range. At the beginning of the competitive range determination, the SSA stated that the competitive range was based on the "merits of each offer" and "the merits of each offer were determined on the basis of" all three evaluation components. AR 2207. The competitive range determination incorporated the SSEB's evaluation of all offerors on each of the three factors. Furthermore, in the analysis following the repetition of the SSEB's ratings, the SSA stated that, except [   ], the agency planned to address price concerns for each offeror in the competitive range, showing that the Army in fact accounted for prices when deciding how to shape the competitive range. The Army likewise acknowledged that one offeror in the range, [   ], had a lower Past Performance rating than others, but because it had an "Acceptable" Technical rating coupled with its price, the Army chose to include it in the range. The Army also stated that the offerors included in the range were included based on Technical and Past Performance "coupled with" price. AR 2268. Even if the Army could have been more detailed, the competitive range determination reflects consideration of all three factors.

Finally, to winnow the number of most highly rated proposals for efficient competition, the SSA prioritized the most important factor: Technical. This was the part of the proposals that told the Army how the offerors would produce parts of military vehicle weapons systems. The SSA chose to include not only the one offer that had a "Good" Technical rating but to expand the range to include those four offers rated "Acceptable" on Technical. He excluded only those offerors whose Technical rating meant they had a high risk of unsuccessful performance. The SSA explained the reasoning behind why each offeror would be included or excluded based on the Army's understanding of its ability to manufacture the needed parts.

We find that the Army reasonably decided to prioritize the Technical factor in creating the competitive range. The Army was not clearly unreasonable in deciding that discussions should be reserved for those offerors who either had a low or moderate risk of unsuccessful performance. It was not required to include all low-priced offerors in the competitive range, particularly not at the expense of lowering its expectations for the Technical proposal. The SSA had the authority to limit the range for efficient competition and chose a perfectly logical cutoff point for inclusion or exclusion.

Loc ultimately argues that the SSA should have included a lengthier discussion of specifically how Past Performance and Price entered into the SSA's decision to exclude Loc. *See* AR 2267. The agency could have included more detail in its discussion of why it excluded five offerors from the competitive range. The comparison that Loc demands, however, goes beyond what was required of the Army. Even if the SSA had included more explanation discussing Loc's Past Performance and Price evaluation, Loc has not demonstrated that the outcome would be different given its technical inferiority. We need not disturb the competitive range determination.

III.   Even if the Army's Evaluation of [     ] was Flawed, Loc is not Prejudiced.

Loc also argues that [     ] was not eligible for award because it is not a responsible contractor and its Past Performance rating was inflated due to misrepresentations. Loc seeks to supplement the administrative record with a Department of Justice press release that may call into question [     ] representations and the responsibility determination.

We do not need to consider the issue. Even if [            ], Loc's position would not be improved and the Army would not be required to redo the procurement. The solicitation stated that the Army could award up to three contracts. It awarded two. [              ] and the Army only awarded an additional contract for increased competition and production capacity. Alternatively, even if the Army needed to select a second contractor, it properly excluded Loc from the competitive range and, thus, Loc would not have a chance of being awarded a contract. Because Loc would not have a substantial chance of being awarded a contract if we found the Army's responsibility determination was made in error or that [           ], we need not address that argument further. The court denies Loc's

motion to supplement the administrative record because the submitted press release is not necessary to effective judicial review.

## CONCLUSION

In sum, because the Army rationally evaluated Loc's proposal and excluded it from the competitive range, we deny plaintiff's motion for judgment on the administrative record and grant the government's motion. The Clerk is directed to enter judgment for defendant. No costs.

s/Eric G. Bruggink  
ERIC G. BRUGGINK  
Senior Judge